## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal Action No. 11-30-GMS |
| | ) | |
| ERIC S. ANDERSON, | ) | |
| | ) | |
| Defendant. | ) | |

Jennifer C. Wasson, Esquire, UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT
OF DELAWARE, Wilmington, Delaware. Attorney for the Plaintiff.

Luis A. Ortiz, Esquire, FEDERAL PUBLIC DEFENDER'S OFFICE, Wilmington, Delaware.
Attorney for the Defendant.

## OPINION

September 23, 2011
Wilmington, Delaware

SLEET, Chief, District Judge

## I.   INTRODUCTION

On April 5, 2011, the Grand Jury for the District of Delaware indicted defendant Eric S. Anderson ("Anderson") for possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g) and 924(a)(2).  Presently before the court is Anderson's Motion to Suppress Evidence.  (D.I. 12.)  The court held an evidentiary hearing in connection with this motion on July 27, 2011 (see D.I. 17) and subsequently directed the parties to file proposed findings of fact and conclusions of law.  After having considered the testimony elicited during the hearing and the arguments presented in the parties' submissions on the issues, the court will deny Anderson's motion.

## II.   FINDINGS OF FACT

At the evidentiary hearing, the United States called one witness: Michael Coleman ("Officer Coleman"), an officer with the Wilmington Police Department (the "WPD"). Anderson called one witness: his mother, Carolyn Anderson.  After listening to the testimony of the witnesses, the court concludes that Officer Coleman's account of the facts is credible.  The following represents the court's essential findings of fact as required by Rule 12(d) of the Federal Rules of Criminal Procedure.

On March 23, 2011, at approximately 12:30 a.m., a resident of the 300 block of Townsend Street in Wilmington, Delaware, called 911 to report that a man was standing on his porch with a gun.  (Tr. at 7-8; Ex. E.)  The resident indicated that the man had knocked on his door, failed to identify himself when asked, and cocked his gun when the resident looked out the window to observe him.  (Id.)  The resident provided the 911 operator with his first name and address and identified the suspect as an African American male wearing black clothing and a

2

black do-rag. (Id.) Upon receiving this call, radio WILCOM, the WPD's radio transmission service, dispatched patrol units to the area, informing officers of the report of an armed African American male wearing black clothing and a black do-rag at the caller's address. (Tr. at 7-8.)

Officer Coleman and his partner, Officer O'Connor, were on patrol on the borderline of their patrol area in the 13th District at the time of the WILCOM transmission. (Tr. at 7:3-7; 10:21-23.) The officers responded to the call and proceeded to the 300 block of Townsend Street, located in the 10th District, because it was a "pretty quiet" night in their district and the report concerned an individual with a gun. (Id. at 8:11-15.) In addition, Officer Coleman was aware that there had been multiple home invasions in the 10th District, that the area of Townsend Street specifically had experienced approximately eight shootings in the past year and a half, and that there was a home invasion and double shooting on the 300 block of Townsend Street in the two to three weeks preceding this complaint. (Id. at 9:2-24.)

Within approximately one minute of the WILCOM transmission, Officers Coleman and O'Connor arrived at A and Heald Streets in the 10th District, approximately one block from the caller's house, where they stopped to observe whether anyone matching the transmission description was in the vicinity.[1] (Id. at 13:13-23.) Approximately two minutes after the WILCOM transmission, and one minute after arriving at A and Heald Streets, Officer Coleman spotted two individuals, a male and a female, on Heald Street. (Id. at 15:9-16.) These individuals were the only people the officers saw in the vicinity of the caller's residence. (Id.) Although Officer Coleman initially thought the two individuals may be together, he did not witness any communication between them and soon recognized that the female had the trunk of

---

[1] Officer Coleman testified that he and Officer O'Connor did not respond directly to the caller's residence because other police units had already arrived at that location. (Tr. at 14:7-11.) As a result, they concentrated their efforts on identifying whether the suspect remained in the area. (Id. at 14:22-24.)

her car open and was walking from her car to her residence while the male, Anderson, was walking away from her general location. (Id. at 17:11-18.)

The officers then drove their marked police vehicle alongside Anderson and noticed that he was wearing a black shirt and black do-rag. (Id. at 18:16-19.) As Anderson continued walking, Officer Coleman also recognized that Anderson was "favor[ing] his right side," an action that he believed, based on his training in the Police Academy and experience as a WPD officer for over three and a half years,[2] to be characteristic of an armed individual. (Id. at 18:23-24.) Specifically, Officer Coleman stated that he could not see Anderson's right side or right arm, though Anderson was walking with a natural gait with his left arm, such that he did not appear to be "walking in a natural manner." (Id. at 19:1-7.) As the officers drove their patrol car alongside Anderson, Officer O'Connor attempted to make contact with him, asking questions to the effect of "Excuse me, can we have a word with you?" and "Can I speak with you?" (Id. at 19:8-13.) Anderson did not reply to Officer O'Connor's questions and instead seemed to "quicken" his pace and walk with "a little more . . . determination." (Id. at 19:14-17.)

After Anderson failed to respond to the officers' attempted contact, they proceeded past him in their vehicle and stopped at the intersection of B and Heald Streets to have a full frontal view of Anderson as he walked toward their car. (Id. at 20:16-23.) From this location, Officers Coleman and O'Connor noticed that Anderson had his right arm against his body and again attempted to make contact with him by saying, "Stop," and "My man, we need to talk to you." (Id. at 20:24-25; 21:14-16.) Anderson responded to the officers, "I'm going to my mom's

---

[2] Office Coleman stated that he has received training in "Simunitions," which he described as "the closest thing to a realistic situation of armed men, reactions, tactical plans, how to take on armed suspects and handle armed suspects." (Id. at 4:19-22.) In addition, Office Coleman indicated that while he was at the Police Academy he participated in armed suspects training, which focuses on identifying "characteristics of armed gunmen [such as] looking for details of a person that is armed, looking for some of their characteristics, how they may blade their body, their mannerisms, indications that show that they may be an armed person." (Id. at 5:12-18.)

house," as he walked "rapidly" in front of the patrol vehicle. (Id. at 21:2-5.) In response to Anderson's failure to stop, the officers then exited their police car, at which time Anderson began running.[3] (Id. at 22:10-12.) Anderson ran past the front of the patrol car, passed between two cars, and crossed the street before running into his mother's house on the 1100 block of B Street and closing the door behind him. (Id. at 22:16-25.) The officers gave chase and noticed during their pursuit that Anderson kept his right hand "completely against his body" at his waistband as he was running, an action that Officer Coleman described as a "dead giveaway for us that he has got something on him he is concealing." (Id. at 23:1-4.)

The officers, unaware as to whether the house into which Anderson ran was his mother's house,[4] and believing that Anderson was concealing a weapon, "fleeing from a crime[,] and possibly about to attempt another," chased him into the house by pushing the door of the residence open.[5] (Id. at 25:12-15.) Upon entering the house, Officer Coleman ordered Anderson to stop. (Id. at 25:22-24.) Anderson did not stop on Officer Coleman's command and instead ran through the living and dining room area into the kitchen, where he tried to open the backdoor but had difficulty doing so because of objects in the way at the base of the door. (Id. at 25:17-21;

---

[3] Anderson's mother, Carolyn Anderson, testified that she was on the couch with her grandson when she heard someone say, "Where are you going," and the reply, "I'm going to my mom's house." (Tr. at 52:1-11.) She also stated that when she heard this exchange she looked out the window and saw Anderson "quickly limping" toward her house. (Id. at 53:8-14.) Mrs. Anderson testified that her son walks with a limp because of a prior gunshot wound to his leg. (Id. at 53:11-12.)
    While Anderson highlights the inconsistency between Officer Coleman's testimony that he was running and Mrs. Anderson's testimony that he "quickly limping," the court does not find this distinction material. Both witnesses' accounts indicate that Anderson did not stop after his exchange with the officers while he was on Heald Street and instead moved at a quick pace toward and into his mother's house. Consequently, regardless of whether Anderson was running or quickly limping, what is material is that he did not yield to the officers' commands. *See infra*, Section III.A.

[4] Officer Coleman testified that it is "very common" in his experience as a WPD officer for a pursued suspect to "go onto someone's property" or "enter into someone's property" to evade police. (Tr. at 25:1-4.)

[5] Officer Coleman, the officer who opened the door to the Anderson residence to pursue the defendant, stated that he does not recall whether the door was locked when he pushed it open with his shoulder. (Id. at 25:12-15.)

26:7-19.) Officer Coleman chased Anderson into the kitchen, "kicked the [back]door closed" with his left foot, and ordered Anderson to the ground. (Id. at 26:20-22.) Anderson "jumped back" from the door and did not move or attempt further flight at that point. (Id. at 26:23-25.) When Anderson did not "go to the ground" as directed by the officers, Officer Coleman "pulled him to the ground," and handcuffed him while he and Officer O'Connor had their weapons drawn. (Id. at 28:1-10.) The officers then proceeded to pat down Anderson and search the washroom, kitchen, and backyard area for a firearm.[6] (Id. at 28:1-10; 40:11-12; 47:14-25.) The officers did not find a gun on Anderson or on the premises during their search, though a "real effort" was made to find it. (Id. at 28:13-17; 40.)

Thereafter, Anderson was taken into custody and transported to the police station, where he was more thoroughly searched. (Id. at 29-30.) During this later search, Officer O'Connor found a firearm in the cuff of Anderson's pant leg. (Id. at 39:3-11.) Upon being notified that a weapon was found on Anderson during the police station search, Officer Coleman added the charges of possession of a deadly weapon during the commission of a felony and menacing to the police report, in addition to the original resisting arrest charge he was drafting when the weapon was found. (Id. at 30:21-24.)

## III. CONCLUSIONS OF LAW

Anderson asserts that the evidence obtained as a result of the above-described arrest must be suppressed as the product of an unreasonable search and seizure in violation of the Fourth Amendment. (See D.I. 12; 19.) Specifically, Anderson contends: (1) that the officers'

---

[6] In her testimony, Mrs. Anderson indicated that the police officers searched for the firearm in her kitchen cabinets, refrigerator, and sofas in the living room area, including the chair in which she was sitting. (Id. 56:23-25.) Officer Coleman, however, maintains that the officers searched only the washroom, the backyard, and the floor of the kitchen, in addition to patting down Anderson. (Id. at 28:1-10; 40:1-12.) In light of Officer Coleman's testimony that the officers at the scene made a "real effort" to find the firearm—including searching the backyard with flashlights—the court finds it unnecessary to determine what specific additional areas were and were not searched, as it is clear that the officers conducted a detailed search in an attempt to find the firearm. (Id.)

warrantless entry into his mother's house was unlawful, thus tainting any evidence ultimately derived therefrom (D.I. 12); and, alternatively, (2) that he was subject to an unlawful arrest with respect to all crimes charged and, therefore, that the evidence found as a result of the arrest is inadmissible pursuant to the exclusionary rule. (D.I. 12; 19). With respect to the latter contention, Anderson first asserts that his arrest for resisting arrest was unlawful because Delaware's resisting arrest statute, 11 Del. C. § 1257(b), does not criminalize flight from detention. (D.I. 19 at 6-8.) Second, Anderson maintains that his arrest for the crimes of possession of a firearm and for menacing was likewise unlawful because whatever probable cause the officers possessed to arrest him for these offenses before their search of his person at his mother's house dissipated when a gun was not found during that search. (Id. at 4-6; D.I. 21 at 1-3.)

Conversely, the government argues that the firearm should be admitted because: (1) the officers' entry into Anderson's mother's house was lawful, in that the officers had probable cause and that the exigent circumstances surrounding the incident precluded the need for a warrant (D.I. 18 at 7-13); (2) the officers possessed probable cause to lawfully arrest Anderson for carrying a weapon and this requisite cause did not dissipate when the firearm was not found during the search at his mother's house (id. at 15-16); (3) the resisting arrest statute criminalizes flight from detention in addition to flight from arrest (D.I. 20 at 1-2);[7] and (4) even if the court concludes that 11 Del. C. § 1257(b) criminalizes only flight from an arrest, the officers had probable cause to arrest Anderson for carrying a weapon from the moment he took flight and, therefore, Anderson's actions in his mother's house constituted resisting arrest within the meaning of the statute (id. at 2, n.1).

---

[7] The Court grants, and has considered, the government's Motion for Leave to Supplement Authorities (D.I. 20), filed in response to Anderson's arguments in his proposed findings of fact and conclusions of law as to the statutory construction of 11 Del. C. § 1257.

**A. Validity of the Officers' Warrantless Entry into Anderson's Mother's House**

The Fourth Amendment protects the rights of individuals to be "secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To this end, the warrantless search of an individual's residence is "presumptively unreasonable," and the evidence derived from such search is inadmissible, unless that search falls within one of the "few . . . and carefully delineated" exceptions to the warrant requirement. *United States v. Coles*, 437 F.3d 361, 365 (3d Cir. 2006) (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984)). Among these, is the exigent circumstances exception, which dictates that law enforcement officers may enter a residence without a warrant if they: (1) have probable cause; and (2) exigent circumstances are present. *See Kirk v. Louisiana*, 536 U.S. 635, 638 (2002).

The Supreme Court has defined probable cause as "facts and circumstances sufficient to warrant a prudent man in believing that [an individual] has committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975). This requisite level of cause is assessed "with reference to the facts and circumstances within the officer's knowledge at the time of the investigative stop or arrest"—regardless of whether the officer has "contemplated the specific offense for which the defendant ultimately will be charged"—to determine if those facts and circumstances "objectively justify the action." *United States v. Laville*, 480 F.3d 187, 194 (3d Cir. 2007) (citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)); *see also Whren v. United States*, 517 U.S. 806, 813 (1996).

Moreover, while reasonable suspicion is insufficient to satisfy the first prong of the exigent circumstances exception, the Supreme Court has held that probable cause may be established where police officers "reasonably suspect that an individual may be engaged in criminal activity, and [that individual] deliberately takes flight when the officers attempt to stop

and question him." *Laville*, 480 F.3d at 194-95 (quoting *United States v. Sharpe*, 470 U.S. 675, 705 (1985) (Brennan, J., dissenting); citing *Sibron v. New York*, 392 U.S. 40, 66-67 (1968)). Thus, reasonable suspicion, which is established when an officer has a "particularized and objective basis for believing that the particular person is suspected of criminal activity," can evolve into probable cause upon the flight of a suspect confronted by law enforcement officers. *See United States v. Brown*, 159 F.3d 147, 149 (3d Cir. 1998); *see also United States v. Smith*, 282 Fed. App'x 143, 148 (3d Cir. 2008) (concluding that where officers had reasonable suspicion to believe a suspect was engaged in a crime and that suspect fled when approached, "the officers' reasonable suspicion undoubtedly transformed into probable cause to arrest").

With respect to the exigent circumstances requirement of this warrant exception, the Third Circuit has established a three-factor test to determine whether such circumstances are present to justify a warrantless entry to arrest a fleeing suspect. *See United States v. Williams*, 612 F.2d 735, 739 (3d Cir. 1979) (citing *Government of the Virgin Islands v. Gereau*, 502 F.2d 914 (3d Cir. 1974)). Specifically, trial courts are tasked with assessing: "(1) the gravity of the offense committed; (2) the [officer's] belief that the suspect was armed; and (3) the likelihood that the suspect would escape in the absence of swift police action." *Id.* In this assessment, the government bears the burden of proving that exigent circumstances existed where a warrantless arrest is challenged. The Third Circuit has identified hot-pursuit, fleeing-suspect, and destruction-of-evidence cases as common examples of such circumstances. *See id.* at 739.

1.    Probable Cause

In the present case, there are a number of facts that provided Officers Coleman and O'Connor with reasonable suspicion to support conducting a *Terry* stop of Anderson to ascertain whether he was carrying a firearm and was the suspect involved in the 911 incident. This

reasonable suspicion, coupled with Anderson's subsequent flight from the officers, combined to establish the probable cause necessary to satisfy the first prong of the exigent circumstances exception. Specifically, and with respect to the facts weighing into the finding of reasonable suspicion, Anderson: was stopped by the officers within two blocks of the 911 caller's residence two minutes after the WILCOM transmission, was one of only two individuals present in the area at 12:30 a.m., was wearing clothing that matched the description of the alleged suspect, quickened his pace when the officers pulled alongside him in their marked police vehicle, failed to stop to talk to the officers when requested, and exhibited characteristics consistent with those of an individual carrying a weapon, such as favoring his right side and walking with his right arm against his body. (Tr. 15-23.) Moreover, the officers were aware that the 10th District was considered a high crime area[8] and that there was a reported home invasion and double shooting on the 300 block of Townsend Street two to three weeks before this incident. (Id. at 9:2-24.)

While Anderson contends that factors such as the similarity of his clothing to that of the described suspect and his presence in the vicinity do not rise to reasonable suspicion (D.I. 13 at 3-4), the reasonable suspicion analysis requires a "totality of the circumstances" assessment that takes into account all circumstances observed by the officers as well as their "inferences and . . . deductions that might well elude an untrained person." *United States v. Meyers*, 308 F.3d 251, 255 (3d Cir. 2002) (quoting *United States v. Cort*, 449 U.S. 411, 418 (1981)); *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002)) (directing the *Terry* analysis to center on "the totality of the circumstances, including the police officer's knowledge, experience, and common sense judgments about human behavior"). Here, the objective facts gave the officers the basis to conduct a *Terry* stop of Anderson to determine whether he was involved in criminal activity.

---

[8] Officer Coleman stated that there had been multiple home invasions in the 10th District as well as approximately eight shootings in the Townsend Street area specifically during the past year and a half. (Tr. 9:2-24.)

*See, e.g., United States v. Goodrich*, 450 F.3d 552, 561-63 (3d Cir. 2006) (identifying, as relevant factors in the reasonable suspicion analysis, whether the defendant was in a high crime area, the time of day, the defendant's temporal and geographic proximity to the alleged criminal activity, and the lack of other persons in the area, and concluding that reasonable suspicion existed for a *Terry* stop where these factors were present).

Given that the officers' reasonable suspicions, the court concludes that Anderson's subsequent flight from the officers established probable cause. Specifically, the officers asked Anderson if they could speak with him while driving on Heald Street and, when they stopped their vehicle at Heald and B Streets and had a full frontal view of the defendant, said "Stop" and "My man, we need to talk to you." Rather than stopping, Anderson quickened his pace to walk in front of the patrol car and stated that he was going to his "mom's house." When Anderson failed to stop at this point, the officers exited their vehicle and Anderson ran (or quickly limped) across the street and up the stairs into his mother's house.[9] The Third Circuit's holding in *United States v. Laville* makes clear that Anderson's failure to accede to the officers' commands and subsequent flight, after the officers had reasonable suspicion to conduct a *Terry* stop, gave them

---

[9] Anderson argues, in connection with the contention that he did not resist arrest, that he did not intentionally prevent the officers' attempted *Terry* stop because the officers' conversation with him was "ambiguous at best" as to their intent to detain him. (D.I. 19 at 6.) Specifically, Anderson asserts that the officers' communications of "excuse me, can we have a word with you? Can I speak with you? . . . stop, my man," were "ambiguous questions" insufficient to "suggest that [he] knew that the officers were effectuating a *Terry* stop." (Id.) Instead, Anderson asserts that the officers' communications merely evidenced a "consensual encounter" from which he had a constitutional right to ignore the officers and walk away. (Id. at 4-5.)

While Anderson raises this assertion in the context of his resisting arrest argument, the court references it at this juncture to address its impact on the possession of a firearm probable cause analysis. Namely, Anderson's argument that the officers' commands were ambiguous does not negate this analysis because the court does not agree with his assessment. Rather, the officers' statements of "Stop" and "my man, we need to talk to you" were sufficiently clear, reflected the officers' intent to stop Anderson, and were reasonably understood by the officers and Anderson to have this meaning. Consequently, because the court concludes that Anderson could understand from the officers' statements that they were trying to stop him and, despite this knowledge, deliberately fled from the officers to escape into his mother's house, his flight sufficiently transferred the officers' reasonable suspicion into probable cause.

the probable cause required to satisfy the first prong of the exigent circumstances exception. *See Laville*, 480 F.3d at 194.

2.    Exigent Circumstances

Anderson also contends that there were no exigent circumstances to justify a warrantless entry into his mother's house. (D.I. 13 at 4.) Specifically, Anderson argues that because he informed the officers that he was "going to [his] mom's house" and proceeded to do so, the "circumstances facing the officers did not give rise to an exigency that would permit warrantless entry," as the totality of the circumstances "reasonably discoverable" to the officers did not meet this level. (Id.) Anderson's assessment of the exigent circumstances analysis, however, is incomplete. As noted, the Third Circuit in *Williams* identified three factors trial courts should consider when determining whether the government has satisfied its burden of proving exigent circumstances: (1) the gravity of the offense committed; (2) the officer's belief that the suspect is armed; and (3) the likelihood that the suspect will escape in the absence of police action. *Williams*, 612 F.2d at 739.

Here, the government has satisfied its burden in light of the facts established. First, Officers Coleman and O'Connor responded to the area based on a WILCOM transmission indicating that a 911 caller reported that there was a man with a gun on his front porch. The caller provided his first name and address to 911 dispatch, gave a general clothing description, and reported that the suspect failed to identify himself and cocked his gun when the caller looked out the window. The presence of an individual with a gun at a residence constitutes an offense sufficiently grave so as to warrant the officers' concern that the circumstances were exigent. In addition, the need to act with dispatch was heightened given the officers' knowledge of recent events in the vicinity. Second, and as Officer Coleman described in his testimony, the officers,

12

upon observing Anderson on Heald Street, believed that his mannerisms were consistent with those of an individual concealing a weapon. Specifically, Officer Coleman indicated that Anderson was favoring his right side, walking in an unnatural manner because he was not moving his right arm, and had his right arm against his body. Moreover, once the officers began to chase Anderson across the street when he took flight, Officer Coleman noticed that Anderson was holding the right side of his waistband, which is an action considered among WPD officers to be a "dead giveaway" that a suspect is concealing a weapon.

Finally, although Anderson argues that exigent circumstances did not exist because he told the officers that he was going to his mother's house and did so, Officer Coleman testified that he and his partner were unaware of the owner of the residence into which Anderson ran and that it was "very common" for fleeing suspects to enter another's property to evade police. Consequently, it was reasonable for the officers to believe that Anderson could have escaped if they did not take action. *See U.S. ex rel. Richardson v. Rundle*, 461 F.2d 860, 864 (3d Cir. 1972) (holding that officers need not accept defendant's denial of wrongdoing where his furtive actions give reason to believe he was an armed robbery suspect). In light of these three considerations and the fact that the officers were in pursuit of a fleeing suspect they had reasonable suspicion to detain, the court concludes that the circumstances were exigent. *See, e.g., United States v. Santana*, 427 U.S. 38, 42-43 (1976) (stating that exigent circumstances may arise when officers are in hot pursuit of a suspect). This finding, coupled with the officers' probable cause, rendered their entrance into Anderson's mother's house lawful. Thus, the firearm recovered from Anderson at the police station will not be suppressed on these grounds.

**B. Validity of Officers' Arrest of Anderson for Possession of a Firearm & Menacing**

Anderson also contends that the evidence found on his person at the police station should be suppressed because the officers did not have probable cause to arrest him for possession of a firearm or menacing when a weapon was not found during the search at his mother's house. (D.I. 13.) A warrantless arrest must be accompanied by probable cause. *See Coles*, 437 F.3d at 365 (citing *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984)). Probable cause is determined from the perspective of an objective law enforcement officer in light of the totality of the circumstances known to that officer at the time. *See Whren*, 517 U.S. at 813 (citing *Scott v. United States*, 436 U.S. 128, 138 (1978)). Thus, an officer's subjective motivation for arresting a suspect is irrelevant. *See id.* at 813 (stating that "subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis"). Moreover, it is well-settled that if probable cause for an arrest is found, the subsequent search incident to that lawful arrest is likewise valid and evidence found during such search is admissible. *See, e.g., Michigan v. DeFillippo*, 443 U.S. 31, 35 (1979); *Chimel v. California*, 395 U.S. 752, 762-63 (1969).

As noted above, the officers here had probable cause to arrest Anderson for possession of a firearm and menacing when their reasonable suspicion evolved into probable cause upon Anderson's flight. *See supra*, Section III.A. Consequently, at the point when the officers entered Anderson's mother's house, they had probable cause sufficient to justify warrantless entry based on the totality of the circumstances at the time. *See id.* Anderson asserts, however, that even if the officers had probable cause to arrest him when they entered his mother's house, whatever probable cause the officers did have dissipated. Thus, when no weapon was recovered

after two pat downs[10] and a search of his mother's house, Anderson argues, his subsequent arrest was unlawful.

To date, it appears the Third Circuit has not directly decided a case involving the fact pattern presented here. The parties' memoranda, however, direct the court's attention to three cases in which its sister circuits have addressed this scenario. Specifically, the government cites *United States v. Craig*, an unpublished Sixth Circuit opinion, and *United States v. Noriega-Lopez*, an unpublished Ninth Circuit opinion, to support its contention that probable cause does not dissipate where evidence of the suspected criminal activity is not found immediately before or after an arrest. *See United States v. Craig*, 198 Fed. App'x 459, 463 (6th Cir. 2006) (concluding that probable cause did not dissipate—even in the absence of finding evidence of criminal activity when the defendant was first arrested—where the evidence was ultimately found during a thorough, booking process search because "[the defendant] could be searched incident to a lawful arrest" and, therefore, the fact that he was not searched thoroughly until later was "immaterial" as to probable cause); *United States v. Noriega-Lopez*, 1995 WL 57169, at *2 (9th Cir. Feb. 9, 1995) (holding that officers had probable cause to lawfully arrest the defendant and this cause did not dissipate even though evidence of drugs was not found in the defendant's truck because the officers believed, based on their observations, that the defendant had unloaded the drugs elsewhere).

Conversely, Anderson identifies the published Ninth Circuit decision in *United States v. Ortiz-Hernandez* to support his assertion that an individual may not be arrested once probable cause dissipates. *See United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005) ("If probable cause is established at any early stage of the investigation, it may be dissipated if the

---

[10] Officer Coleman testified that Officer O'Connor patted down Anderson after he was initially handcuffed. (Tr. at 39.) He also stated on cross-examination that, although he did not see Anderson patted down a second time, WPD protocol dictates that a suspect be patted down before being placed in the police vehicle. (Id. at 48:3-5.)

investigating officer later learns additional information that decreases the likelihood that the defendant has engaged, or is engaging, in criminal activity."). In *Ortiz-Hernandez*, the Court of Appeals cites to decisions of the Fifth and Seventh Circuits, which hold that a corollary to the rule that law enforcement officers may rely on the totality of the circumstances readily discoverable to them to establish probable cause, is that "they also must not disregard facts tending to dissipate probable cause." *Id.* (quoting *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988); citing *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) ("The continuation of even a lawful arrest violates the Fourth Amendment when the police discover additional facts dissipating their earlier probable cause.")). To this end, where probable cause has dissipated and an unlawful arrest is made, evidence derived from that arrest may be suppressed pursuant to the exclusionary rule. *See DeFillippo*, 443 U.S. at 35-36.

The court is persuaded by the rationale of these decisions. The court concludes, therefore, that the officers' fruitless search of Anderson's person, both when he was handcuffed and before being placed in the patrol car, coupled with their failure to find a firearm during their search of his mother's kitchen floor, washroom, and backyard, dissipated their original probable cause and rendered his arrest unlawful. Until that point, the officers' reasonable suspicion that Anderson was carrying a firearm was generated from the fact that: his clothing matched the description of the suspect identified by the 911 caller, he was in the vicinity of the caller's residence within two minutes of the 911 call, he was in a high crime area after midnight, he failed to respond to the officers' requests that he stop to talk to them, and his mannerisms were consistent with those of an individual concealing a weapon. While these factors were, in combination, sufficiently specific to establish probable cause when coupled with Anderson's flight, the officers' probable cause significantly weakened when a firearm was not found.

The government's argument notwithstanding, the Sixth and Ninth Circuit rulings it cites above involve facts that are distinguishable from those in this case. First, though the facts in *Craig* are similar to the instant case, in that the arresting officer did not find evidence of the defendant's participation in criminal activity until he was thoroughly searched during booking, the cases are dissimilar with respect to the level of descriptive specificity provided to the officers in each. In *Craig*, the police radio transmission stated that the suspect was driving an old white Nissan and was wearing a red hat displaying a picture of the Tasmanian Devil. Consequently, while the officer in *Craig* failed to find evidence of criminal activity during his first search of the defendant, the fact that the defendant's car and hat matched the unique description sent out in the transmission elevated the level of probable cause so as to cause it to remain even through the second search. Here, the transmission indicated only that the suspect was wearing black clothing and a black do-rag—dress comparatively more common than the hat described in *Craig*. This more general description resulted in the diminution of the officers' probable cause when evidence of criminal activity was not found either on Anderson or at his mother's house.

Moreover, as compared to the officers in *Noriega-Lopez*, who saw the defendant back his truck into a garage and depart with less cargo than when he went in, thereby reasonably concluding that the drugs the defendant was suspected of carrying were dropped off at that location, the officers here had Anderson in almost constant view from the time of their initial contact with him through his arrest. Officers Coleman and O'Connor followed immediately behind Anderson into his mother's house and proceeded to chase him through the living room and into the kitchen. The officers did not see Anderson enter any other rooms of the house or make any movements indicating that he was attempting to hide the weapon. Officer Coleman testified that Anderson was patted down for weapons at least once before being transported to the

police station, and that the officers searched the backyard with flashlights in addition to searching the kitchen floor and washroom. Officer Coleman described the officers as making a "real effort" to locate the weapon.

Consequently, unlike in *Noriega-Lopez*, where the court could conclude that an objectively reasonable officer would have believed that the defendant moved the evidence in question such that an additional, more thorough search was required, the officers here did not witness similar activity from Anderson. Officer Coleman also did not intimate as much in his testimony. Specifically, while the government argues that the officers retained probable cause even after they did not find the weapon because, in light of the circumstances known to the officers at the time, the "officers . . . could reasonably believe that the defendant had hidden the firearm somewhere in the house, and that they could not find it without securing a warrant" (D.I. 18 at 14-15), Officer Coleman's testimony suggests otherwise. In particular, Officer Coleman stated that: he and the other officers made a "real effort" to find the firearm at Mrs. Anderson's house but failed to do so; Anderson was arrested for resisting arrest, rather than for possession of a firearm and menacing, because the weapon was not found; and he planned to charge Anderson only with resisting arrest in his police report due to the absence of the firearm. Also, during his testimony, Officer Coleman gave no indication that he and the other officers planned or made efforts to obtain a search warrant to find the weapon.

While it is well established that an officer's subjective motivation for arresting a suspect is irrelevant in the probable cause analysis, the facts recited here from Officer Coleman's testimony are relevant in depicting the totality of the circumstances that would have been readily discoverable to an officer at the time. *See Whren*, 517 U.S. at 813 (identifying the "objective law enforcement officer['s] perspective" based on the totality of the circumstances known at the time

as the lens through which the probable cause analysis is evaluated). In light of these facts, the court concludes that the probable cause justifying the officers' warrantless entrance into Mrs. Anderson's house to arrest Anderson for possession of a firearm and menacing dissipated when a weapon was not found because an objective officer would not have believed probable cause existed at the time of the arrest in light of the surrounding circumstances. In view of the foregoing, Anderson's arrest for possession of a firearm and menacing was unlawful. For the reasons that follow, however, the firearm will not be suppressed in this case.

### C. Validity of Officers' Arrest & Subsequent Search of Anderson for Resisting Arrest

Anderson also asserts that the officers did not have probable cause to arrest him for resisting arrest because his actions did not fall within the conduct prohibited by Delaware's resisting arrest statute. (D.I. 19 at 4-6.) This statute, 11 Del. C. § 1257, states that an individual commits a class A misdemeanor when that person "intentionally prevents or attempts to prevent a peace officer from effecting an arrest or detention of the person or another person or intentionally flees from a peace officer who is effecting an arrest." 11 Del. C. § 1257(b). The parties propose differing interpretations of the meaning of 11 Del. C. § 1257(b). (D.I. 19 at 6-8; D.I. 20 at 1-2.) Anderson contends that the statute does not criminalize flight from detention and, therefore, that his failure to stop on Herald Street did not violate the statute.[11] (D.I. 19 at 6-8.) Conversely, the government asserts: (1) that the statute criminalizes flight from detention, as well as from arrest (D.I. 20 at 1); and, in the alternative (2) that even if the statute criminalizes flight only from an arrest, the officers here had probable cause to arrest Anderson from the

---

[11] Anderson argues that the statute should be construed to criminalize "intentionally fleeing from a peace officer who is effecting an arrest," but not fleeing from a *Terry* stop or similar detention. (D.I. 19 at 7.) Anderson asserts that this interpretation is consistent with the Third Circuit's instruction in *United States v. Cooper* that "courts should construe statutory language to avoid interpretations that would render any phrase superfluous," and, therefore, criminalizes flight from arrest, but not detention. (Id.) (citing *United States v. Cooper*, 396 F.3d 308, 312 (3d Cir. 2005)).

moment he took flight and, as a result, Anderson's actions in his mother's house constituted resisting arrest within the meaning of the statute (D.I. 20 at 1-2, n.1).

As noted, probable cause is determined from the perspective of an objective law enforcement officer in light of the totality of the circumstances known at the time, and is established where that officer has a particularized and objective basis for believing that an individual is suspected of criminal activity. *See Laville*, 480 F.3d at 194; *Whren*, 517 U.S. at 813. Probable cause can also be established where an individual commits a misdemeanor offense in the presence of a law enforcement officer. *See United States v. Watson*, 423 U.S. 411, 418 (1976) (concluding that, in keeping with the "ancient common-law rule," an officer has probable cause sufficient to make a warrantless arrest where that officer witnesses a person committing a misdemeanor). It is well-settled that where this requisite level of cause is met, officers can conduct a search incident to that lawful arrest without "additional justification," and evidence obtained from this subsequent search is admissible.[12] *See Virginia v. Moore*, 553 U.S. 164, 177 (2008); *see also DeFillippo*, 443 U.S. at 35.

Here, Officers Coleman and O'Connor had probable cause to arrest Anderson for possession of a firearm and menacing when he took flight on Herald Street. Although the officers' probable cause to arrest Anderson for these offenses ultimately dissipated after their

---

[12] In its memorandum, the government correctly notes that the Delaware Supreme Court has held that where the underlying arrest a defendant is alleged to have resisted is unlawful, any evidence derived from a search in connection with the underlying offense may be suppressed as tainted by that unlawful arrest. *See Carter v. State*, 814 A.2d 443, 446 (Del. 2002) ("[T]he crime of resisting an illegal arrest does not necessarily carry with it the right to justify any search incident to an actual arrest for the crime of resisting an illegal arrest." (citing *Jones v. State*, 745 A.2d 856, 872 (Del. 1999)). While the government contends that this holding is inconsequential here because "the officers were justified in detaining and attempting to arrest the defendant," the court also adds that the Delaware Supreme Court's holding is not binding on this court based on the nature of the action. Specifically, and as highlighted by the U.S. Supreme Court in *Virginia v. Moore*, while states are free to create laws that afford their citizens greater constitutional protections, "state restrictions do not alter the Fourth Amendment protections." *Moore*, 553 U.S. at 176-77 (concluding that where state law did not allow arresting officers to search the defendant and the officers' only constitutional violation was a violation of state constitutional law, "it is not the province of the Fourth Amendment to enforce state law" where the officers' actions in question adhered to the constitution). Thus, in assessing whether Officers Coleman and O'Connor's search of Anderson was lawful, Fourth Amendment jurisprudence, rather than state law constitutional protections, appropriately guide the analysis.

unsuccessful search for the firearm at Mrs. Anderson's house, the officers had probable cause to arrest Anderson when they followed him into his mother's house and commanded him to stop. Anderson failed to comply, however, and instead continued to move through the house and attempted to escape through the backdoor. Anderson stopped only when Officer Coleman kicked the backdoor closed, blocking his exit. Based on these facts, the court concludes that Anderson's actions constituted flight from an arrest and, therefore, violated Delaware's resisting arrest statute. Thus, because the court agrees with the government's contention that Anderson resisted arrest by his flight and attempted escape once inside his mother's house, the court need not address the issue of whether § 1257(b) criminalizes flight from detention.

The court further concludes that Officers Coleman and O'Connor had probable cause to arrest Anderson for resisting arrest and, therefore, that the arrest was lawful. Anderson argues that the officers did not have probable cause to arrest him for this offense because § 1257(b) requires that an individual "intentionally" resist arrest, and the officers' communications with him were "ambiguous" to the extent that he could not have known the officers were trying to stop or arrest him. (D.I. 19 at 5-6.) In particular, Anderson asserts that the officers did not have probable cause because, based on the alleged ambiguity of their statements, the officers could not reasonably believe that Anderson knew of their intent to stop him and, thus, could not have concluded that he violated the statute. (Id. at 6.)

In view of the facts established, however, the court disagrees with Anderson's contention that the "intent" requirement of § 1257(b) was not satisfied. Specifically, and as discussed above,[13] the officers' communications with Anderson were sufficiently clear such that Anderson could understand that the officers were trying to stop him on Herald Street. *See, e.g., Shelton v. State*, 628 A.2d 84 (De. 1993) (concluding that there was sufficient evidence to support a jury

---

[13] *See supra* note 9.

21

finding of resisting arrest where police officers "manifested an intent to effect an arrest" of the defendant by stating "Police, Stop"). Anderson's flight, therefore, could reasonably be perceived as an intentional act aimed at resisting the officers' attempt to conduct a *Terry* stop and, ultimately, to arrest him once inside his mother's house. In light of this finding, the officers could reasonably conclude, based on Anderson's actions and the totality of the circumstances, that they had witnessed Anderson commit the misdemeanor of resisting arrest, providing them with the probable cause required to initiate a lawful arrest. *See Watson*, 423 U.S. at 418. Thus, because Officers Coleman and O'Connor had probable cause to lawfully arrest Anderson for resisting arrest, their subsequent search of his person at the police station as a search incident to that arrest was constitutional and, therefore, the firearm cannot be suppressed on this ground.[14] *See Moore*, 553 U.S. at 177.

## IV.    CONCLUSION

For the foregoing reasons, the court hereby denies the defendant's motion to suppress.

---

[14] The court is aware that its ruling may raise a concern that the door has been opened to police officers to inappropriately cross constitutional boundaries without consequence. To the contrary, this court firmly believes that well trained and properly motivated law enforcement officers understand their obligations to protect and defend the constitution as well as the citizens they are sworn to serve. The court believes that these officers, in the vast majority of instances, act in accord with their understanding and committment. Nevertheless, those who become overwhelmed by their zeal to catch the "bad guys" should know that their actions will inevitably be challenged by lawyers representing the accused and that those challenges will be closely examined by courts such as this. In this case, as noted above, Anderson's arrest was not based on pretext and, indeed, he does not make that assertion in his Motion to Suppress Evidence.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Criminal Action No. 11-30-GMS |
| | ) |
| ERIC S. ANDERSON, | ) |
| | ) |
| Defendant. | ) |

## **ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY

ORDERED THAT:

1. The defendant's Motion to Suppress Evidence (D.I. 12) is DENIED.

Dated: September **23**, 2011

_____
CHIEF, UNITED STATES DISTRICT JUDGE